STATE OF NORTH CAROLINA v. EDDIE HUDSON

No. 8126SC930

(Filed 2 March 1982)

**1. Homicide § 21.9— voluntary manslaughter—sufficiency of evidence**
    In an action in which defendant was charged with the murder of his former wife, the evidence was sufficient to survive defendant's motion to dismiss and to require submission of the charge of voluntary manslaughter to the jury where the evidence tended to show that the victim was last seen alive by her grandchildren arguing with defendant some time after 1:00 a.m.; that she was found dead by them around 11:00 a.m. the same day; that the victim died from a stab wound to the chest and the knife blade was found in the

wound; that two paper towels were found in a trash can on top of a handle which matched the knife blade found in the victim's body; that laboratory analysis showed that the blood spot had an enzyme component matching defendant's blood; that the children had neither heard nor seen anyone enter the house during the night; that there were no signs of forcible entry; and that defendant's room, when he was arrested, bore blood spots that matched defendant's A-B-O grouping.

**2. Constitutional Law § 30— test on blood stained towels—admissibility of**

In a homicide case, admission of testimony regarding tests done on blood stained towels was proper since defendant was aware of the existence of the paper towels and of the lab results showing that the blood thereon could have been defendant's and could not have been the victim's. Had defendant made a timely motion concerning the towels, he could have had an independent analysis of the blood spots on the towels; however, a period of more than six months elapsed from the date of seizure to the date of defendant's motion seeking exclusion of evidence regarding tests done on the paper towels, and more than six months had elapsed since the towels had been destroyed.

**3. Criminal Law § 89.2— testimony concerning TV movie at time of crime—admission not prejudicial error**

In a homicide case in which one of the victim's grandchildren stated she had seen defendant and the victim arguing at a time when a western movie was on TV, it was not prejudicial error to allow an officer to testify that he "set up an appointment with Channel 18 to view a western movie" that was shown after the time defendant had stated he had left the victim's home.

**4. Criminal Law § 75.3— statements by defendant—admissibility**

Where all the evidence presented at a *voir dire* hearing on a motion to suppress statements made by defendant to an officer indicated that the statements were made freely and voluntarily and with the full understanding of defendant's rights, the trial court properly admitted the statements.

APPEAL by defendant from *Allen, Judge.* Judgment entered 29 January 1981 in Superior Court, MECKLENBURG County. Heard in the Court of Appeals 9 February 1982.

Defendant was tried on a bill of indictment charging him with the murder of Daisey Inez Harris. The jury returned a verdict of voluntary manslaughter and defendant was sentenced to twenty years imprisonment.

*Attorney General Edmisten by Assistant Attorney General Lisa Shepherd, for the State.*

*Assistant Appellate Defender Marc D. Towler, for the defendant.*

MARTIN (Robert M.), Judge.

Defendant argues four assignments of error on appeal. We have considered each assignment and conclude that the trial court committed no error which would entitle defendant to a new trial.

[1]   The defendant's major challenge is to the sufficiency of the evidence to survive the motion to dismiss.

> Upon defendant's motion for dismissal, the question for the Court is whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense. If so, the motion is properly denied. *State v. Powell*, 299 N.C. 95, 98, 261 S.E. 2d 114, 117 (1980).

The evidence presented by the State must be sufficient to convince a rational trier of fact to find each element of the crime beyond a reasonable doubt. *State v. Riddle*, 301 N.C. 153, 270 S.E. 2d 476 (1980); *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed. 2d 560 (1979).

> The evidence is to be considered in the light most favorable to the State; the State is entitled to every reasonable intendment and every reasonable inference to be drawn therefrom; contradictions and discrepancies are for the jury to resolve and do not warrant dismissal; and all of the evidence actually admitted, whether competent or incompetent, which is favorable to the State is to be considered by the court in ruling on the motion. (Citations omitted.)

> The trial court in considering such motions is concerned only with the sufficiency of the evidence to carry the case to the jury and not with its weight. [Citations omitted.] The trial court's function is to test whether a *reasonable inference* of the defendant's guilt of the crime charged may be drawn from the evidence. (Citations omitted.)

> The test of the sufficiency of the evidence to withstand the motion is the same whether the evidence is direct, circumstantial or both. [Citation omitted.] "When the motion . . . calls into question the sufficiency of circumstantial evidence, the question for the Court is whether a reasonable

inference of defendant's guilt may be drawn from the circumstances. If so, it is for the jury to decide whether the facts, taken singly or in combination, satisfy them beyond a reasonable doubt that the defendant is actually guilty." *State v. Rowland*, supra. [Citations omitted.] In passing on the motion, evidence favorable to the State is to be considered as a whole in order to determine its sufficiency. This is especially true when the evidence is circumstantial since one bit of such evidence will rarely point to a defendant's guilt.

*State v. Powell*, supra at 99, 261 S.E. 2d 117-18.

State's evidence disclosed that Daisey Harris was last seen alive by her grandchildren sometime after 1:00 a.m. on 30 December and that she was found dead by them around 11:00 a.m. the same day. Her body was found in the hallway of her house which adjoined the living room. She was lying in a pool of blood, and there was blood on the walls. Blood-like spots also were found on the piano and piano stool in the living room. The victim had died from a stab wound to the chest and the knife blade was found in the wound. The medical examiner testified that she might have been alive as late as 8:00 a.m., but that it was not probable.

In the kitchen, one paper towel was found on a table and two were found in a trash can on top of a handle which matched the knife blade found in the victim's body. The paper towels were spotted with blood. Laboratory analysis showed that the blood spots had an enzyme component matching defendant's blood, and not matching the victim's.

Defendant previously had been married to the victim, but they were divorced, and were seeing each other again at the time she was killed. On the night of the killing, defendant went to the victim's house, and around midnight he indicated that he intended to stay there. At that time he and the victim were alone in the house. He was seen at the victim's house between 1:15 and 1:30 a.m. when her grandchildren were left there. Sometime between 1:00 and 2:30 a.m. defendant was seen by a grandchild arguing with the victim in front of the piano in the living room. This was the last time the victim was seen alive. The next morning the grandchildren were alone in the house with the victim's body. Neither child had heard or seen anyone enter during the night

and there were no signs of forcible entry. Officers conducting the investigation of the crime found no evidence of broken windows or forcible entry at the Harris residence.

Items found in defendant's room when he was arrested bore blood spots that matched defendant's A-B-O type. Defendant had a cut on each hand, one on the middle finger of his right hand and one on his left thumb. The police asked defendant when he had gotten home and what time he had left the residence of Daisey Inez Harris. "One time he mentioned 11:00. He finally settled with the time of 12:00 and that he had gotten home at 12:30 at the latest." Considering this evidence in the light most favorable to the State, there was substantial evidence that the defendant committed the crime charged, requiring submission of the case to the jury.

[2] The defendant's next contention is that the court erred in denying his motion to dismiss or in the alternative to exclude evidence regarding tests done on certain paper towels. In ruling on the motion, the trial court found as fact:

6. That during a Crime Scene Search, four paper towels were removed from the scene containing human blood and that this blood was analyzed and determined on analysis, to contain a similar enzyme typing as found in defendant's blood following a separate analysis, an enzyme type different from that found in the victim's blood following analysis; that this finding was known to defendant no later than April, 1980 and that on each occasion that the case was called for trial from February through March, April and May the defendant moved for the continuance of his case, which was granted. The basis for the request for continuance being that the defendant be given additional time to prepare for trial of the case;

7. That the paper towels were retained in the Property Control Center of the Charlotte Police Department from December through June, with exception of the time that they had been removed by various authorized personnel for observation and analysis; that it is standard procedure in Property Control for an Investigating Officer or an Officer in control of the case to receive, after a period of ninety days, a Disposition Sheet requesting a determination as to whether the

evidence should be retained further or might be destroyed; that such a sheet was forwarded to Officer Howey, who mistakenly thought that the case had been disposed of and authorized destruction of the paper towels; that the paper towels were destroyed on June 10th, 1980 in accordance with Officer Howey's authorization;

8. That upon learning that the case had not been disposed of and before he knew that the towels had been destroyed, Officer Howey went to the Property Control Room in an effort to preserve the towels as evidence, but learned that the destruction had already occurred;

9. That in June, 1980, after the towels had been destroyed, the defendant moved to be permitted to have an independent analysis done of the blood appearing on the paper towels; that no such motion was filed from January until the latter part of June and that no request had been made by the defendant that the evidence be secured or retained and that up to this time, all Motions for Continuance in the case have resulted from defendant's requests and same was granted to provide ample time and additional time to defendant to prepare his case; that specifically, on May 14, 1980, the defendant was advised, through his counsel, during discussions concerning a possible plea in the case, that the analysis had indicated presence of blood similar to that of the defendant's, but at that time, motion [sic] was lodged concerning the towels; that the motion concerning the blood analysis was filed on June 16, 1980 and that the full discovery compliance occurred on February 15, 1980.

10. That the destruction of the towels was purely inadvertent; that no one, including the defendant, suggests that there was any bad faith involved on the part of the officers or the Property Control Unit, and at this date no one has any way of knowing precisely what an independent analysis would have shown;

11. That the blood analysis that was made of the defendant's blood confirms the accuracy of analysis to this time;

12. That defendant will have full opportunity to cross examine the expert witness, if called, by the State to challenge

the admissibility of the evidence on other grounds, and his rights will be fully protected in regards to confrontation;

13. That had the defendant chosen to make a timely Motion concerning the towels, there is no reason to believe or suggestion that they could not and would not have been retained; that the Motion was not timely in that a period of more than six months has lapsed from date of seizure to date of the filing of the motion, as well as a lapse of more than six months from date of seizure to the time of destruction;

14. That neither Officer Howey or Officer Guerette nor Mr. Fasnacht had any intention to deprive the defendant of the evidence and all parties concerned acted in good faith concerning the evidence involved in the subject of this Motion.

Defendant relies upon cases decided by the United States Supreme Court in arguing that the court erred in denying his motion. He cites *Brady v. Maryland*, 373 U.S. 83, 10 L.Ed. 2d 215, 83 S.Ct. 1194 (1963) and *United States v. Agurs*, 427 U.S. 97, 49 L.Ed. 2d 342, 96 S.Ct. 2392 (1976) as authority for his position. We find neither *Brady* nor *Agurs* applies to the case *sub judice* because this is not a case of undisclosed evidence. The defense was aware of the existence of the paper towels, of the lab results showing that the blood thereon could have been defendant's and could not have been the victim's. Had the defendant acted in a timely fashion, he could have had the independent analysis of the blood spots. No error has been shown in the trial judge's findings of fact, and the conclusion of law he reached is supported by these findings. We find no constitutional rights of defendant have been violated.

[3] The State presented evidence through the investigating police officer that a western movie was being shown on channel 18 between 1:00 and 2:30 a.m. the night the deceased was killed. LaShawn Harris testified that she and her brother went to her grandmother's house that night after midnight. After she got there, she and her brother started watching a western movie on T.V. "Sometime" while they were watching T.V. she left the room to go to the bathroom, and at that time the deceased and the defendant were arguing. She went on from the bathroom to bed and did not see her grandmother anymore. Defendant argues

that the testimony regarding the movie the grandchildren were watching was inadmissible hearsay. He argues that the name of the movie and the time that it was shown "were obviously not firsthand knowledge on the part of Officer Guerette."

Officer Guerette testified that he "set up an appointment with Channel 18 to view a western movie that was—that La-Shawn and O.J. were observing the night that this occurred," and that "[t]he name of the movie was 'The Last Command'; it had been shown between 1 o'clock and 2:30, on the night of the 30th of December, 1979." There is no indication in the record that Officer Guerette did not know these facts from firsthand observation. Conceding *arguendo* that the challenged evidence was hearsay and therefore inadmissible, defendant has failed to show its admission was reversible error. Teresa Harris testified that she took her children to spend the night with the deceased on the night of the killing, and that the defendant opened the door to let the children in the house, "[t]hat was between 1:15 and 1:30." Thus, there was another unchallenged evidence which tended to place defendant at the victim's home after 10:30, the time he had told police he left there, and nearer to the time she was killed. At most, the challenged evidence was cumulative, supporting the other evidence that defendant was at the scene at the time of the killing and not a major element of proof. No prejudicial error was committed in admission of the challenged testimony.

[4] Officer Guerette arrested the defendant at his motel room the day after the murder and read him his Miranda rights. He asked the defendant, "Do you understand each and every one of these rights?" The defendant indicated that he did. Guerette also asked him, "Do you understand that when you start talking to me, you can stop talking with me at any time?" Defendant indicated "yes." Guerette then asked the defendant two questions, the responses to which the defendant argues should have been suppressed because the State allegedly failed to show that he had waived his Miranda rights. A defendant may waive his Miranda rights, provided the waiver is made voluntarily, knowingly and intelligently. *Miranda v. Arizona*, 384 U.S. 436, 16 L.Ed. 2d 694, 86 S.Ct. 1602 (1966). Neither a specific written nor oral waiver is necessary, the question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the right delineated in the Miranda case. *North Carolina v. Butler*, 441 U.S.

369, 60 L.Ed. 2d 286, 99 S.Ct. 1755 (1979). In the present case, all the evidence presented at the *voir dire* hearing on the motion to suppress showed that the defendant's statements to the officer were made freely and voluntarily and with the full understanding of his rights. The trial court properly admitted the statements made by the defendant following his arrest.

In the trial we find no prejudicial error.

No error.

Judges WEBB and WELLS concur.